JODI LINKER
Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:  (510) 637-3500
Cellular telephone :  (415) 517-4879
Email:  Joyce_Leavitt@fd.org

Counsel for Defendant TAUNTON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT TAUNTON,<br><br>Defendant. | **Case No.:** CR 22–00437 JST<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 6, 2nd  Floor<br>**Hearing Date:** October 18, 2024<br>**Hearing Time:** 9:30 a.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................i

I.      INTRODUCTION ............................................................................... 1

II.     LEGAL FRAMEWORK ...................................................................... 3

III.    DISCUSSION .................................................................................... 4

        A.      Imposition of 60 Months Custody is Consistent with the Sentencing Factors ..... 4

                1.      Dr. Coles' assessment that Mr. Taunton poses a low risk of
                        recidivism, along with his other opinions, supports a sentence of 60
                        months................................................................................ 4

                2.      Mr. Taunton suffers from congestive heart failure, which is a
                        significant factor warranting a sentence of 60 months ........................... 6

                3.      Mr. Taunton's history and characteristics warrant a variance and
                        imposition of 60 months custody ................................................ 7

                        i.      Upbringing and trauma ................................................. 7

                        ii.     Post-offense rehabilitation ............................................ 8

                4.      The nature and circumstances of the offense ......................................... 10

                5.      The collateral consequences for these offenses are severe ................... 10

        B.      The Government Has Not Carried Its Burden for Restitution ........................... 11

IV.     CONCLUSION.................................................................................. 13

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                     **Page(s)**

*California v. Brown*,
   479 U.S. 538 (1987) ........................................................................................... 7

*Kimbrough v. United States*,
   552 U.S. 85 (2007) ............................................................................................ 3

*Nelson v. United States*,
   555 U.S. 350 (2009) ........................................................................................... 3

*Paroline v. United States*,
   572 U.S. 434 (2014) ......................................................................................... 11

*Pepper v. United States*,
   562 U.S. 476 (2011) ........................................................................................... 8

*United States v. Booker*,
   543 U.S. 220 (2005) ........................................................................................... 3

*United States v. Hoffman*,
   2022 WL 4017890 (W.D. Wash. Aug. 30, 2022) ............................................... 11, 12, 13

*United States v. Lloyd*,
   2020 WL 4038241 (N.D. Ohio July 17, 2020) ...................................................... 13

*United States v. Rodriguez*,
   No. 23-50024, 2024 WL 3338311 (9th Cir. July 9, 2024) ........................................ 11

*United States v. Ruff*,
   535 F.3d 999 (9th Cir. 2008) ................................................................................ 8

*United States v. Trujillo*,
   713 F.3d 1003 (9th Cir. 2013) ............................................................................... 8

**Federal Statutes**

18 U.S.C. § 2252 ...................................................................................................... *passim*

18 U.S.C. § 3553 ................................................................................................... 3, 7, 8

18 U.S.C. § 3664 ....................................................................................................... 11

1

2

## I.    INTRODUCTION

Robert Taunton is a 36-year-old man who will be sentenced by this Court based upon his guilty pleas to distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b) (Count One), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Count Two). Mr. Taunton grew up in a chaotic environment with an autistic twin brother who was prone to outbursts and an alcoholic father who responded to those outbursts with anger, threats and occasional violence. As a consequence, Mr. Taunton endeavored to make himself as invisible as possible while his parents' energies were focused on his brother.[1] When he was 14 years old, Mr. Taunton was sexually assaulted by an older individual who he had trusted as a friend. In his mid-20's, he became addicted to adult pornography and later child pornography, as his isolation grew around the pandemic-shutdown period of 2020-2022 and he retreated more and more to the internet.

Now that he has had some distance and time away from the computer since his arrest almost two years ago, in December 2022, Mr. Taunton understands how destructive and harmful his actions were both to those with whom he communicated, as well as to others whose pictures and videos had been circulating around the internet and traded indiscriminately. As a result of his crimes, Mr. Taunton faces a mandatory minimum of 60 months in prison (with guidelines that are much higher). The only question before the Court at this juncture is the sentence to be imposed. The Court should sentence Mr. Taunton to no more than 60 months imprisonment. There are a number of reasons why this sentence is appropriate in this case.

First, an expert who evaluated Mr. Taunton concluded that he poses a low risk for reoffending. Specifically, Dr. Jeremy Coles, PhD, who has worked for the State of California for 23 years evaluating over 1500 sex offenders and opining on diagnostic questions, risk of recidivism, and issues related to psychological and sexual functioning in every one his evaluations, believes that Mr. Taunton is at low risk for committing another child pornography crime. According to Dr. Coles, Mr. Taunton's deviant conduct was related to his significant social isolation, compounded by the

---

[1] Filed under seal are medical records from March 2000, when Mr. Taunton was 11 years old describe a boy who was depressed, had tried to choke himself with a sweatshirt, and was struggling for attention. *See* Kaiser Family Records at bates FPD – 4267-68.

1  pandemic, and his behavior may be viewed as "aberrant and not indicative of his underlying sexual

2  tendencies." *See* Confidential Report of Psychological Evaluation dated July 28, 2024 ("Cole

3  Report") filed concurrently under seal at pp. 17-18. Dr. Coles further concluded that Mr. Taunton

4  presently has a "significantly more realistic understanding" of what he was doing and has expressed

5  desire to engage in sex-offender treatment to further understand his behavior which would "likely

6  further reduce his already low risk for reoffending." *Id*. at p.18. Dr. Coles' expertise and years of

7  working for the state government to safeguard the community makes him eminently qualified to

8  assess and render his opinions about Mr. Taunton.

9      Second, Mr. Taunton was diagnosed at the age of 24 with TTN mutation dilated

10  cardiomyopathy, a genetic mutation that leads to a weakened heart and places patients at high risk of

11  heart failure. *See* Exhibit A. Mr. Taunton's grandfather and uncle both have dilated cardiomyopathy,

12  and a cousin with the mutation died of the disease in her 30's. Coles Report at p. 6. Although he is

13  only 36 years old, Mr. Taunton already has experienced multiple episodes of heart failure. Moreover,

14  in 2016, when he was 27, he suffered a stroke caused by a blood clot in his brain. Exhibit A. A letter

15  from Mr. Taunton's cardiologist confirms his episodes of heart failure, as well as the fact that Mr.

16  Taunton had a defibrillator implanted in his chest in 2017, after it was determined that the stroke was

17  related to his disease. *Id*. The cardiologist also confirmed that "advanced heart failure cardiologists"

18  already have been consulted at times regarding Mr. Taunton's care. *Id*. Thus, although for many

19  defendants the difference of an additional year, month, or even day in custody may seem to this Court

20  to be statistically insignificant, for a 36-year-old living with congestive heart failure who already has

21  suffered more than one life-threatening episode, any additional day in prison that this Court imposes

22  beyond the mandatory minimum sentence is significant.

23      Finally, the other sentencing factors, including Mr. Taunton's history and characteristics --

24  including his chaotic upbringing and being molested when he was 14, in addition to the emotional toll

25  of living with a non-curable, deadly disease from age 24, which Mr. Taunton must think about and

26  manage every day -- further supports the requested sentence of 60 months imprisonment. Mr.

27  Taunton's post-offense rehabilitation, assistance to his neighbors, and the support he provides to his

28  parents, including his father who is now 91 years old, also justify the requested sentence.

Mr. Taunton files this sentencing memorandum in support of his request. Attached in support of his sentencing memorandum is (1) a July 3, 2024 letter from general cardiologist Dr. Carolyn Enders MD (Exhibit A); (2) a September 30, 2024 letter from Mr. Taunton (Exhibit B); (3) an October 1, 2024 letter from Mr. Taunton's parents (Exhibit C). Filed concurrently *under seal* is the (i) Confidential Report of Psychological Evaluation of Jeremy Coles dated July 28, 2024 ("Coles Report"); (ii) select pages from Kaiser Permanente medical records from 2012 to the present[2] ("Kaiser Records"); and (iii) select pages from the Child, Adolescent and Family Data records from Kaiser Permanente from March 2000 ("Kaiser Family Records").

## II.    LEGAL FRAMEWORK

The Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005), and the sentencing factors listed in 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory, and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). Instead, the Court also must consider a number of sentencing factors set out in 18 U.S.C. § 3553(a) and must specifically impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  In other words, every day of custody must be necessary. Here, a sentence of 60 months imprisonment meets these goals of sentencing.

The probation officer who prepared the PSR recommends that the Court vary downward from the advisory guidelines of 97-121 months, and impose a sentence of 75 months custody, based upon Mr. Taunton's childhood trauma including sexual abuse, as well as significant health concerns including his congestive heart failure. PSR, Sentencing Recommendation at p. 2-3. Mr. Taunton appreciates the recognition that a variance is warranted but asks the Court to vary further and impose no more than the mandatory minimum sentence of 60 months custody. His request is based on the factors identified by probation, as well as the expert assessment of Dr. Coles, who has worked for the State of California for more than two decades, evaluating individuals convicted of various sex-related

[2] Undersigned counsel received in excess of 4000 pages of medical records should the Court wish to view Mr. Taunton's entire Kaiser medical file.

crimes and conducting assessments in cases such as these. For all these reasons, the Court should sentence Mr. Taunton to 60 months custody.

## III.   DISCUSSION

### A.   Imposition of 60 Months Custody is Consistent with the Sentencing Factors

#### 1.   Dr. Coles' assessment that Mr. Taunton poses a low risk of recidivism, along with his other opinions, supports a sentence of 60 months

Dr. Coles' long history working with the State of California to safeguard the community from individuals who pose a danger, and his experience evaluating similar cases, indicate that he is well positioned to evaluate Mr. Taunton's psychological and sexual functioning and render a risk assessment and recommendation in this case. Dr. Coles has for 23 years served as an expert for the State of California, evaluating sexually violent predators, conducting risk assessments for the state's Conditional Release Program for 10 years, and conducting mentally disordered offender evaluations for seven years. Coles Report at p.1. Dr. Coles has evaluated over 1500 sex offenders to opine on diagnostic questions, risk for recidivism, and issues related to psychological and sexual functioning in every one of the evaluations. *Id*.

In assessing Mr. Taunton, Dr. Coles reviewed a number of documents and also performed a Psychological Assessment Inventory (PAI) test. Coles Report at pp. 2-3. The PAI is an objective psychological measure that assesses psychopathological syndromes, and can provide information relevant for clinical diagnosis, treatment planning, and screening for psychopathology. *Id*. at p.11. Importantly, validity scales are built into the PAI to objectively assess whether a person is providing an accurate portrayal of their underlying psychological functioning.[3] *Id*. Mr. Taunton's PAI was determined to be valid. *Id*. In Mr. Taunton's assessment, no significant personality deficits (such as "antisocial character types") were found, *id*. at p.12, nor did Mr. Taunton endorse any "cognitive distortions" commonly found in individuals who molest children. Rather, he expressed a genuine understanding that sexual contact between adults and minors is always inappropriate. *Id*. at p.9.

---

[3] In rendering his opinion, Dr. Coles also examined Mr. Taunton's past behavior to assess for various disorders and examined his psychiatric history, relationship history, and sexual history. Coles Report at pp.7-9. Mr. Taunton, who considers himself bisexual, has had long-term relationships with women in the past, as well as sexual encounters with men. *Id*. at p.8.

1    Furthermore, he did not rationalize or suggest that minors are somehow responsible; he understands

2    they are always victims. *Id*.

3       Dr. Coles further determined that Mr. Taunton does *not* meet the diagnostic criteria for

4    Pedophilic Disorder,[4] which generally is used to infer whether an individual is at some risk for

5    committing a hands-on sex offense against a child. *Id*. at pp.12-13. He based his opinion on the

6    absence of a number of factors, including the facts that Mr. Taunton had never tried to actually meet

7    up with anyone in person[5] and had been in only adult relationships, and his interest in child

8    pornography, which began in 2020, did not appear to be pervasive or long-standing. *Id*. at p.14.

9       Dr. Coles also evaluated the risk that Mr. Taunton poses based upon a qualitative analysis of

10   meta-analytic factors, as well as the Static-99-R, considered to be "the most widely used risk

11   assessment measure related to general sexual recidivism." *Id*. at p.15. According to Dr. Coles, the

12   results of these tests scored Mr. Taunton in "the low risk category." *Id*. Finally, Dr. Coles reviewed

13   "dynamic risk factors," which are factors that can change over time, particularly with treatment.

14   These factors have been found through empirical research in the field to be related to sexual

15   recidivism, and include intimacy deficits, sexual self-regulation, lack of cooperation in supervision,

16   and general self-regulation. *Id*. at pp.16-17. Using his extensive expertise and experience, as well as

17   his thorough assessment including objective tools and measures, Dr. Coles stated:

18           The current evaluation reveals Mr. Taunton to be of low risk for
             committing another child pornography crime and even lower risk of
19           committing a hands-on sex offense against a minor. His behavior. . .
             reveals some level of sexual deviancy . . . that said, the expression of this
20           deviancy was situational and related to . . . significant social isolation. . .
             compounded by the Covid-19 pandemic. In 2020, he lived largely in a
21           virtual reality and failed to take account of the fact that the individuals
             used were . . . victims themselves. Over a short time, he developed an
22

23   _____

24   [4] The DSM diagnostic criteria for Pedophilic Disorder includes the following: (A) Over a period of at
     least 6 six months, recurrent, intense sexually-arousing fantasies, sexual urges or behaviors involving
25   sexual activity with a prepubescent child or children (generally age 13 years or younger); (B) The
     individual has acted on these sexual urges, or the sexual urges or fantasies caused marked distress or
26   interpersonal difficulty; and (C) The individual is at least 16 years and at least 5 years older than the
     child or children in Criterion A. Coles Report at pp.12-13 (citing the DSM-V Criteria for Pedophilic
27   Disorder).
     [5] Dr. Coles is aware that Mr. Taunton contacted teenage boys via the internet and exchanged
28   messages as well as sexually explicit pictures and videos, Coles Report at pp.10-11, but in making his
     assessment distinguishes between contact with individuals virtually on the internet as opposed to
     trying to make plans to meet minors in person.

> addiction to pornography and some . . . was child pornography. It is my opinion that his behavior at the time of the controlling offenses can be viewed as aberrant and non indicative of his underlying sexual tendencies. At present, he has a significantly more realistic understanding of what he was doing and how people are victimized.

Coles Report at pp.16-18. Based on Dr. Coles' assessment, imposition of 60 months custody is sufficient but not greater than necessary to meet the goals of sentencing.

### 2.    Mr. Taunton suffers from congestive heart failure, which is a significant factor warranting a sentence of 60 months

When Mr. Taunton was 24 years old, he was diagnosed with TTN mutation dilated cardiomyopathy, a genetic mutation that leads to a weakened heart and puts patients at high risk for dangerous arrhythmias (irregular heartbeats) that can lead to death. Exhibit A; PSR ¶¶ 80, 83-86. When Mr. Taunton went to the hospital in 2012, a few weeks after his 24th birthday, all his organs were enlarged due to the excess fluids related to his heart failure, and his condition was deemed severe. *See* Kaiser Records at Bates FPD 1217-1220; Coles Report at p.6. The condition is genetic; Mr. Taunton's maternal uncle and grandfather both have the mutation and heart condition. Coles Report at p.6. Moreover, a cousin who also had the genetic mutation died of the disease in her 30's. *Id*.

When Mr. Taunton was 27 years old, in 2016, he suffered a stroke and was rushed to the hospital. His weakened heart led to blood pooling, which formed a clot that migrated to his brain, causing the stroke.[6] PSR ¶ 83; Exhibit A. A defibrillator was placed in Mr. Taunton's chest a year later because he was having arrythmia, which his cardiologist determined had contributed to his 2016 stroke. *Id*. ¶ 84. The defibrillator shocks the heart whenever there is an arrhythmia to get it back into rhythm, as well as paces Mr. Taunton's heart to get the correct rhythm.[7] *Id*. Mr. Taunton also take numerous medications every day to help prevent the arrythmia. *Id*. ¶ 86. A 24-hour monitoring system collects data regarding Mr. Taunton's heart functioning, which is sent every night to a cardiac nurse, who reviews the information and contacts Mr. Taunton when the data indicates that

---

[6] Fortunately for Mr. Taunton, the immediate response by his co-worker who called 911 as soon as he understood that something was wrong with Mr. Taunton, and quick actions by doctors who located the clot on his brain and removed it while Mr. Taunton was kept awake, saved him. PSR ¶ 83.

[7] At least once or more each month, Mr. Taunton can feel his heartbeat get out of sync and the defibrillator step in to pace it. *Id*.

adjustments to medication or other proactive steps are needed. *Id*. ¶ 84. Mr. Taunton also experiences

sharp, stabbing headaches in the spot where the blood clot was removed in 2016, and often worries

about whether he is suffering another stroke when they occur. *Id*. ¶ 85. *See also* Exhibit C ("In 2016

Robby suffered a sudden, severe stroke . . . which left his entire right side paralyzed . . .  the

experience left Robby shaken, and he still fears that the outcome from another stroke might be much

worse. It hasn't been easy for him to deal with this disability."). Mr. Taunton's most recent list of

medication is extensive and underscores the life-threatening condition that he must pay attention to

every day. *Id*. ¶ 86; Kaiser Records at Bates FPD-0001.

According to his cardiologist:

> Mr. Taunton's weakened heart puts him at risk for heart failure. He has
> had episodes of heart failure in the past. . . he is cared for by me, a general
> cardiologist. . . we have also included at times an advanced heart failure
> cardiologist and electrophysiologist in his care.

Exhibit A. Dr. Coles also references Mr. Taunton's serious heart condition, noting that "from a

purely psychological perspective, this appears to be a factor that should be taken into consideration."

Coles Report at p.18. Mr. Taunton's serious heart condition, which also affects his life expectancy,

warrants the Court imposing no more than 60 months custody.

### 3.    Mr. Taunton's history and characteristics warrant a variance and imposition of 60 months custody

#### i.    Upbringing and trauma

Under 18 U.S.C. § 3553(a), Mr. Taunton's history and characteristics are a factor to be

considered. "Evidence about the defendant's background and character is relevant because of the

belief, long held by this society, that defendants who commit criminal acts attributable to a

disadvantaged background, or to emotional and mental problems, may be less culpable than

defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987).

As discussed above, Mr. Taunton is a 36-year-old man who was raised in a two-parent home in

El Sobrante, along with his fraternal twin, Alexander, who was born with Aspergers Syndrome on the

Autism spectrum.[8] *See* PSR ¶ 77. Both parents had previous marriages, and Mr. Taunton's father,

---

[8] Alex Taunton was later diagnosed with bi-polar disorder as well. Coles Report at p.4.

1    who was twenty years older than his mother and is now 91 years old,[9] retired to care for his sons

2    while his mother continued to work as a nurse. PSR ¶ 78. Mr. Taunton's father struggled with

3    alcoholism when Mr. Taunton was younger, which compounded the challenges of containing and

4    disciplining his brother. Mr. Taunton witnessed his father's aggression towards his brother with

5    trepidation and helplessness. *Id.*; *see also* Exhibit C ("Robby felt responsible for Alex's welfare,

6    trying his best to be his both guardian and defender.").[10]

7        Moreover, when he was a freshman in high school, he was sexually assaulted as described in

8    more detail in the PSR. PSR ¶ 79. It was something Mr. Taunton buried away and never talked about

9    until recently. *Id.*; Coles Report at p.4. But it was clearly traumatic, especially as it involved someone

10   who Mr. Taunton knew and had considered a friend. *Id.*

11       Since he has been on pretrial supervision, Mr. Taunton has participated in treatment including

12   counseling, which has been very helpful. PSR ¶ 87; Exhibit B. He is looking forward to getting

13   additional counseling to address what underlying issues may have contributed to the offense. *Id*. Mr.

14   Taunton's history and characteristics support a sentence of no more than the mandatory minimum of

15   60 months.

16                          **ii.    Post-offense rehabilitation**

17       This Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *See*

18   *United State v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that

19   post-sentence or post-offense rehabilitation – particularly in light of its tendency to reveal a

20   defendant's likelihood of future criminal conduct – [is] a critical factor to consider in the imposition

21   of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (*citing Pepper v. United*

22   *States*, 562 U.S. 476, 491-93 (2001)). Such rehabilitation is "the most up-to-date picture" of a

23   defendant's history and characteristics, which in turn sheds light on whether a defendant will be

24   deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1)).

25   In his report, although Dr. Coles identified Mr. Taunton's conduct as "aberrant," Coles Report at

26

27   _____

28   [9] PSR ¶¶ 77, 81.
     [10] Kaiser Permanente records dating back to when Mr. Taunton was 11 years old corroborate that Mr.
     Taunton struggled within this family dynamic. *See* Kaiser Family Records at Bates FPD-004265-81

pp.17-18, it also is clear that Mr. Taunton has spent the past two years reflecting on his actions from 2020-2022, and participating in programming which has contributed to his post-offense rehabilitation.

At the time of his arrest in December 2022, Mr. Taunton was deep into his addiction to child pornography, isolated, and living in a "virtual world" in which he failed to take account of the fact that the individuals with whom he was communicating, as well as those in the pictures or videos he received or distributed, were victims. As he explained in his letter to the Court:

> Distance from the internet as well as talking with mental health professionals has helped me better understand how my crimes affected the victims and I am truly sorry.

Exhibit B. *See also* Exhibit C ("[W]e have . . . seen many changes in him."). Since his arrest, Mr. Taunton has been attending individual and group therapy through the Hope program,[11] which has been helpful in teaching him cognitive-behavioral techniques that allow him to process his emotions more effectively. Coles Report at p.3. Furthermore, in the past two years since he stopped accessing child pornography (as well as any pornography) sites, Mr. Taunton has been able to recenter himself, and realizes the wrongfulness of his conduct. *Id*. at pp.10, 11. Mr. Taunton also plans to seek out counseling to better understand his behavior at the time of the controlling offense. *Id*. at p.11. He is remorseful and recognizes how his actions harmed others. *Id*.; PSR ¶¶ 50-52. Exhibit C ("he . . . has learned how his action have long term negative impacts . . . which he had not fully appreciated before counseling").

The conduct for which Mr. Taunton will be sentenced dates back to 2021 and 2022, and since then he has worked hard to rehabilitate himself. He has gained insight into his actions and is remorseful. The man who will stand before the Court on October 18, 2024, for sentencing is different than the individual who was isolated, lived in a virtual reality, and acted on compulsions and addiction without any clarity of thought. Mr. Taunton's rehabilitation is a factor for the Court to consider. He has been reckoning with his actions and continues to gain additional tools for the future. For all of these reasons, a sentence of no more than 60 custody is sufficient.

---

[11] Because of the change in the district's contract provider, Mr. Taunton will be getting a new therapist effective October, 2024.

### 4.    The nature and circumstances of the offense

Mr. Taunton agrees that the offense conduct in this case is extremely serious. That conduct is described in the plea agreement. Plea Agreement ¶ 2. *See also* PSR ¶¶ 7-17. The circumstances surrounding his involvement in the offense conduct is also described above and in the Coles Report. Coles Report at pp.9-11, 17-18. In reflecting upon his arrest and current criminal dilemma, Mr. Taunton stated:

> [I]n some ways it has been a blessing that this happened because I haven't had . . . urges to look at that stuff. What I did  . . . there are no excuses for . . . I realize how wrong it is and . . . don't want to do that again.

*Id.*  Significant to Dr. Coles' assessment that Mr. Taunton poses a low risk of recidivism is the fact that Mr. Taunton did not try to meet with anyone in person. Coles Report at p.13. ("While Mr. Taunton reached out to individuals in this age range . . . there is no evidence to suggest he was trying to meet up with them. Additionally, he has been involved in adult relationships and, in fact . . . only been in adult relationships . . . Mr. Taunton's interest in child pornography . . . does not appear to be so pervasive and long-standing. . . [but] is more likely that situational and life history factors led to his use of this pornography."). Based upon the nature and circumstances of the offense, five years in prison is sufficient. Any additional time beyond five years would be greater than necessary.

### 5.    The collateral consequences for these offenses are severe

Mr. Taunton will suffer significant collateral consequences in addition to whatever term of custody the Court imposes. Mr. Taunton will be required to register as a sex offender and will be labeled as such and monitored for life. There will be restrictions on where Mr. Taunton can live and what he can do for the rest of his life.  For example, he will be unable to go certain places that might put him into unsupervised contact with minors and unable to live within a certain distance from parks and schools. In this case, the collateral consequences of Mr. Taunton's guilty plea include the following:

- He has faced public humiliation for his offense with family members and others
- He will have **lifetime registration as a sex offender** for all the public to see
- His employment, housing, and other opportunities will be restricted by his registration status
- He will need to pay restitution in this case despite his limited financial means

- He will have to comply with strict supervision conditions that bear the threat of incarceration and severely impede on his personal life

In addition, pleading guilty to any felony offense includes the loss of certain rights which include forfeiting the right to possess a firearm and the right to vote, the right to hold certain offices, and the right to obtain certain licenses. In sum, the collateral consequences which Mr. Taunton will experience the rest of his life constitute just punishment, as well as both general and specific deterrence. No additional time in prison beyond the five years required by statute is warranted.

### B.    The Government Has Not Carried Its Burden for Restitution

The government bears the burden of establishing that the defendant's conduct proximately caused the victims' claimed losses and the amount of those losses for purposes of restitution. *United States v. Hoffman*, 2022 WL 4017890, at *2 (W.D. Wash. 2022); *see* 18 U.S.C. § 2259(b)(3) (requiring restitution order to be "issued and enforced in accordance with section 3664"); 18 U.S.C. § 3664(e) (requiring government to prove "the amount of the loss sustained by a victim as a result of the offense"); *Paroline v. United States*, 572 U.S. 434, 443 (2014) (interpreting identical language in pre-amendment version of statute as placing burden on the government). To carry its burden, the government must provide the Court with sufficient information to allow it to "determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim." 18 U.S.C. § 2259(a). The Court then "shall order restitution in an amount that reflects the defendant's relative role in the causal process that undermines the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b).

In determining whether to order restitution, and how much, from a particular defendant under the statute, the Court must conduct a "loss causation analysis." *See United States v. Rodriguez*, 2024 WL 3338311, at *2 (9th Cir. 2024) (on plain-error review, reversing restitution awards of $3,000 and $5,000 to child-pornography victims because record did not show that district court conducted necessary analysis). The Court's restitution calculation must not be based on "arbitrary calculations." *Hoffman*, 2022 WL 4017890, at *2 (internal quotation marks omitted). Nor may it order restitution if the victim's "total aggregate recovery . . . exceed[s] the full amount of the victim's demonstrated

losses . . . The court may require the victim to provide information concerning the amount of restitution the victim has been paid in other cases for the same losses." 18 U.S.C. § 2559(c).

As summarized in the PSR, the government has provided restitution packets from five victims who are seeking restitution. 8 Kids ($5,000); Jenny (no less than $3,000); Surferhair/Jessy ($5,000); Tara ($10,000); Vicky/Lily ($10,000).[12] The government recently provided information via email about the number of files of each victim Mr. Taunton possessed:

- Victim Series "8Kids" = 2 images and 1 thumb file
- Victim Series "Jenny" = 0 images and 1 video
- Victim Series "SurferHair" = 2 images and 0 videos
- Victim Series "Tara" = 1 image and 4 videos
- Victim Series "Vicky" = 0 images and 2 videos

However, the government has *not* provided information for each of these victims about how many restitution orders have been entered and how much of their losses have been recovered through these restitution orders. Without at least this information, there is no way for the Court to determine if the victims already have received the full amount of losses they are claiming.

Moreover, in their restitution packets at least two of the victims (Vicky/Lily and Tara/Sloane) claim that the Court should take into account in setting restitution that Mr. Taunton was charged with distribution. But the distribution that Mr. Taunton pled to *was not distribution of these victims' images. Cf.* PSR ¶¶ 8-10 (distribution on Kik of adolescent males under the age of 13 or 15); Plea Agreement ¶ 2 (admitting to posting on Kik 13-year-old ejaculating). There thus does not seem to be any basis for at least any of these female victims claiming that Mr. Taunton was convicted of distributing their images. Similarly, these two victims also suggest that restitution should be higher because that some of their images are particularly egregious, but there is no information here about

---

[12] In another case in this district in which the defendant was convicted of possessing child pornography, the Court accepted the parties' restitution stipulation and ordered restitution of the following amounts to three of the victim's seeking restitution in this case: $3,000 to Jenny, $3,000 to Jessy, and $0 to Tara. *United States v. Hartman*, No. 20-00126 VC, Dkt. 46 at 2 (May 19, 2021). In *Hoffman*, the following victims who are seeking restitution in this case sought restitution in the following amounts: Jenny (no less than $3,000), 8 Kids ($3,000-$15,000), Tara ($3,000), Vicky ($10,000). 2022 WL 4017890, at *2.

1   whether their images Mr. Taunton possessed were particularly egregious.

2          Finally, some of the restitution packets seek compensation for expenses and related to conduct

3   for which Mr. Taunton clearly bears no responsibility. For example, some of the packets seek

4   restitution for harms suffered before and/or after Mr. Taunton's possession of the images. *See United*

5   *States v. Lloyd*, 2020 WL 4038241, at *4 (N.D. Ohio 2020) (excluding from Tara's total claimed loss

6   amount counseling, insurance and housing "costs that occurred prior to Defendant's conduct"

7   because, as government agreed, "a defendant is not responsible for harm that occurred before the date

8   of his offense"; cleaned up). The packets do not disaggregate losses from other people's distribution

9   of the images from the possession for which Mr. Taunton was convicted.

10         Several of the packets also talk about harm from actual harassment by people who had

11   identified them from their images, which has nothing to do with Mr. Taunton. Vicky's packet claims

12   future employment losses based on clearly outdated information: the "updated" 2014 vocational/lost-

13   wages expert report that does not reflect that she started a Ph.D. program in 2017. Vicky's attorney

14   also seeks reimbursement for expenses that have nothing whatsoever to do with Mr. Taunton's case,

15   including "Travel costs for *Paroline* argument," printing costs for *Paroline* amicus briefs, and "alaska

16   airlines re-route of flight for NCMEC meeting," without any explanation why Mr. Taunton should be

17   responsible for these costs.[13]

18         Given the lack of significant information about the defendant's relative role in causing the

19   victims' claimed losses, the district court in *Hoffman* set restitution at the $3,000 statutory minimum

20   for each victim, as the defendant had requested. 2022 WL 4017890, at *3, 7. Given these problems

21   with the restitution packets and the government's failure to carry its burden in this case, the Court

22   should order restitution of the statutory minimum of $3,000 per restitution claimant.

23   **IV.   CONCLUSION**

24         For the reasons stated, Robert Taunton respectfully requests that the Court impose a sentence of

25   no more than 60 months custody, followed by a five-year term of supervised release and restitution.

26

27   [13] Although a victim's losses may include "reasonable attorneys' fees, as well as other costs incurred" "by the victim, as a proximate result of the offense involving the victim," 18 U.S.C. § 2259(c)(2), it is
28   unclear how expenses for travel to and briefing for an entirely different case should be counted as reasonable attorneys' fees.

Dated:    October 3, 2024                    Respectfully submitted,

                                            JODI LINKER
                                            Federal Public Defender
                                            Northern District of California

                                            _____/S_____
                                            JOYCE LEAVITT
                                            Assistant Federal Public Defender

# EXHIBIT A

**EXHIBITS IN SUPPORT OF
DEFENDANT'S SENTENCING
MEMORANDUM**

**The Permanente Medical Group, Inc.**
**CARDIOLOGY DEPARTMENT**
**3600 BROADWAY**
**OAKLAND CA 94611-0000**
**Dept: 510-752-6474**

July 3, 2024

Robert D Taunton

████████████████

To Whom It May Concern,

Robert Taunton has TTN mutation dilated cardiomyopathy. This is a genetic mutation that leads to a weakened heart and places patients at high risk for dangerous arrhythmias. The arrhythmias typical of this condition can lead to passing out and even death. Robert has a defibrillator implanted to try to stop one of these dangerous arrhythmias and needs to take medications regularly to prevent arrhythmias.

His weakened heart puts him at risk for heart failure. He has had episodes of heart failure in the past, and needs to take a number of medications to help support his heart pump function and maintain his volume status. His weakened heart lead to blood pooling and then causing a clot which went to his brain causing a stroke in 2016.

He is cared for by me, a general cardiologist, and followed in the device clinic routinely. We have also involved at times advanced heart failure cardiologists and electrophysiologists in his care.

Sincerely,

CAROLYN LING ENDERS MD

*This letter was originally viewed by Robert D Taunton on 7/3/2024 2:19 PM.*

# EXHIBIT B

**EXHIBITS IN SUPPORT OF
DEFENDANT'S SENTENCING
MEMORANDUM**

Honorable Judge Tigar                                        September 30, 2024


Dear Judge Tigar,

      I want to express to you how regretful I am of my actions.  Distance from the internet as well as talking with mental health professionals has helped me better understand how my crimes affected the victims and I am truly sorry.  What I did and the trauma I inflicted on others weighs heavy on my shoulders and I wish I could take back what I've done. Words cannot express the amount of remorse I feel for the crimes I committed.

Sincerely,

Robert Daniel Taunton

# EXHIBIT C

**EXHIBITS IN SUPPORT OF DEFENDANT'S SENTENCING MEMORANDUM**

October 1, 2024

The Honorable Jon S.Tigar
Oakland Courthouse, Courtroom 6, 2nd Floor
1301 Clay Street
Oakland, CA 94612

Re: Robert Daniel Taunton, Case Number 4:22-cr-00437-JST-1

Dear Judge Tigar:

We write to you on behalf of our son, Robert (Robby) Daniel Taunton who has pleaded guilty to the charges in this case. We are both retired (Carole L. Taunton, a former Registered Nurse/Hospital Supervisor; Robert L. Taunton a former Telecommunications Engineer).

Our son Robby is one half of a set of twins and has always been responsible, helpful, and kind. He was the one to remind us of important times and dates and to remember where either of us had left our wallet, phone or car keys. His twin brother, Alex, whose later diagnosis placed him on the autistic spectrum, challenged all of us with behavior that was frequently both aloof and unpredictable. As Alex struggled to fit in a world that he couldn't understand, Robby was baffled and hurt by his brother but remained sympathetic and caring. Starting in pre-school (and later through some pretty rough years in elementary and middle school grades) Robby felt responsible for Alex's welfare, trying his best to be his both guardian and defender.

Even with this burden, Robby did well throughout his school years; his grades were well above average, and he participated in school activities that included handbell/vocal choirs in middle school years and a Robotics Club during high school. Robby's high school grades were high enough to earn his admission at UC Santa Barbara where he hoped to graduate with a Mechanical Engineer degree. Unfortunately, he was unable to cope with the impersonal nature of a large academic institution, and he also missed home, family and friends. At the end of his freshman year, he reluctantly decided to drop out, get a job and pursue his education later.

Since then, he has been employed consistently except for a period of about a year when, in 2012, he was stricken with sudden onset congenital cardiomyopathy that took many months of treatment before he was able to return to his job. Four years later in 2016 Robby suffered a sudden, severe stroke due to the cardiomyopathy which left his entire right side paralyzed. While immediate heroic action by the local EMTs and Kaiser Permanente

-2-

prevented long term damage, the experience left Robby shaken, and he still fears that the outcome from another stroke might be much worse. It hasn't been easy for him to deal with this disability.

Nonetheless, our experience with Robby is that he has always been kind to everyone. He is very generous with his time and skills with both his many friends and with the many members of our large family. If *anyone* ever needs *anything*, Robby is (and has always been) quick to volunteer his help and to offer his services. We have always relied heavily on Robby for help around our home, and, on a weekly basis, he attends to the needs of both of his aged, widowed grandmothers, where he does regular chores, runs errands and helps them solve the problems they inevitably have with anything electronic. In addition to Robby's physical contributions to our household, we also value and trust his knowledge, expertise and judgment when we need to make big decisions. His incarceration will have a very real and significant impact on all of us.

Robby's arrest was a shock for us since he had never before been charged with lawbreaking of any kind, not even a vehicular moving violation. Since then, we have had several brief and painful conversations with him and have seen many changes in him. Robby admits knowing that what he did was unlawful, and he acknowledges that his actions must certainly have long term negative impacts on the victims which he had not fully appreciated before counseling. He deeply regrets his unlawful activity.

We, too, are keenly aware of the seriousness of the crime to which Robby has pleaded guilty; we do not condone his illegal activity and we understand that his plea mandates a period of incarceration. While we are devastated by the fact that Robby faces prison time, we understand that it's difficult for you to make such important decisions regarding someone that you don't know personally. We hope this letter has given you some sense of Robby's remorse.

Thank you for your time and consideration.

Sincerely,

*Carole Jaunton*
*Robert Jaunton*